1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PORT OF SEATTLE,

Plaintiff,

v.

THE BOEING COMPANY,

Defendant.

No. 2:22-cv-00993-RAJ

**THE BOEING COMPANY'S
MOTION TO STAY**

**NOTE ON MOTION CALENDAR:
SEPTEMBER 2, 2022**

## CERTIFICATION

On August 15, 2022, Boeing discussed the basis for its motion to stay thoroughly with the Port. The parties were unable to reach an agreement that would eliminate the need for the motion.

## INTRODUCTION

Over the past eight years, dozens of parties have engaged in an intensive allocation process to determine their respective shares of responsibility for the costs of cleaning up the Lower Duwamish Waterway—a priority hazardous waste site targeted for cleanup by the EPA. On the doorstep of completing that process, the Port of Seattle has decided to abandon it and start all over. The Port seeks to circumvent the carefully-crafted allocation process to which it previously agreed and in which it participated for eight years until it filed suit. An eight-month stay is warranted to allow that process to be completed before the Port may proceed with its lawsuit for three reasons.

BOEING'S MOTION TO STAY
(No. 2:22-cv-00993-RAJ) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**First**, "[i]f this litigation continues, it could potentially disrupt or even derail the ongoing settlement process." *Confederated Tribes & Bands of Yakima Nation v. Airgas USA, LLC*, 435 F. Supp. 3d 1103, 1128 (D. Or. 2018). The parties engaged in this process—Boeing, the City of Seattle, King County, and many others—need only finalize their agreements, negotiate the consent decree with the EPA to implement the cleanup, and present the decree to a court for approval. The parties expect to complete this work within a year, but they cannot do so if they are embroiled in adversarial litigation. And if the Port's lawsuit continues before the settlements are finalized, Boeing will have little choice but to assert protective third-party contribution claims against the parties with whom Boeing is currently negotiating. The Port should not be allowed to jeopardize an eight-year settlement process—and with it, the health of the Lower Duwamish Waterway.

**Second**, successful settlements would significantly reshape the Port's lawsuit and save judicial resources. To give just two examples: (a) the settlements would set the responsibility of the participants but not the Port, rendering any prior litigation over the percentage of costs to be divided between the Port and Boeing in the lawsuit a waste of time; and (b) the settlements also would render the settling parties immune from contribution claims, making any prior litigation over such claims a waste of time. A stay will therefore conserve party and judicial resources.

**Third**, a stay will not harm the Port. The Port's lawsuit is ultimately a lawsuit over money. So at worst, a stay might delay the Port's recovery of money. "Courts routinely grant stays that would delay recovery of money damages because money damages compensate a plaintiff for their injury regardless of when the money damages are awarded." *Naini v. King Cnty. Pub. Hosp. Dist. No. 2*, No. C19-0886-JCC, 2020 WL 468910, at *2 (W.D. Wash. Jan. 29, 2020). And the stay will better define the amounts at issue as between Boeing and the Port, thereby benefiting the Port.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

## FACTS

2  **A.    Legal Background**

3           In enacting the Comprehensive Environmental Response, Compensation, and Liability Act

4  ("CERCLA"), 42 U.S.C. § 9601 et seq., Congress had two main goals: (i) to encourage the

5  "expeditious and efficient cleanup of hazardous waste sites," and (ii) to ensure that polluting

6  parties pay for cleanup. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir.

7  2001) (internal quotation marks & citation omitted). To achieve these goals, CERCLA imposes

8  strict, retroactive, joint, and several liability on certain classes of persons for the cleanup of

9  environmental contamination, known as "potentially responsible parties," or PRPs. *Arizona v. City*

10 *of Tucson*, 761 F.3d 1005, 1011 (9th Cir. 2014).

11          At many large contaminated sites, as here, cleaning up contamination can cost hundreds of

12 millions of dollars. Litigating responsibility for shares of cleanup costs among even just a few

13 parties often takes a decade or more, at an enormous cost to courts and parties both in terms of

14 time and dollars. *See, e.g.*, Docket, *Exxon Mobil Corp. v. United States*, Civ. Action Nos. H-10-

15 2386, H-11-1814 (S.D. Tex.) (CERCLA case involving only two parties that lasted 11 years from

16 filing to dismissal of multiple appeals). As a result, at many contaminated sites where numerous

17 parties might be responsible for large cleanup costs, the parties collectively engage an experienced

18 private, neutral CERCLA lawyer to conduct a non-binding alternative dispute resolution process

19 resulting in the allocator's recommended allocation of cleanup costs among the parties based upon

20 equitable factors. *See* Off. of Site Remediation Enf't, EPA, *Developing Allocations Among*

21 *Potentially Responsible Parties for the Costs of Superfund Site Cleanups* (Oct. 1994).[1]

22          This is precisely the process that was—and still is—occurring with respect to

23 contamination in the Lower Duwamish Waterway. The waterway is a Superfund site,

24 contaminated by decades of releases associated with the use of the waterway (and associated

25

26
_____
[1] Available at https://www.epa.gov/sites/default/files/2020-02/documents/allocation-prps-1994.pdf.

BOEING'S MOTION TO STAY
(No. 2:22-cv-00993-RAJ) – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    upland properties) as Seattle's major industrial corridor. *See* EPA, *Record of Decision, Lower*

2    *Duwamish Waterway Site* 1 (Nov. 2014) ("Record of Decision").[2]

3    **B.    The EPA-Authorized Cleanup Study and Multi-Party Allocation Process to Date**

4              In 2000, Boeing, the Port, the City of Seattle, and King County (known as the "Lower

5    Duwamish Waterway Group") entered an administrative order on consent with the EPA and the

6    Washington State Department of Ecology to conduct and pay for studies regarding contamination

7    in the Lower Duwamish Waterway and to determine the best plan for cleaning it up. Compl. ¶ 17.

8    Each member of the group agreed to pay 25% of the cost of these early studies, with the

9    understanding that those shares later would be re-allocated. *Id.* ¶ 18. The Lower Duwamish

10   Waterway Group is continuing its work on the waterway under amendments to the administrative

11   order on consent and under the EPA's supervision. And the group members were all aware that it

12   would take many years and cost many millions of dollars to clean the Lower Duwamish Waterway.

13   In fact, the EPA has estimated that cleaning up the waterway will cost $342 million. *See* Record

14   of Decision, at iii.[3]

15             Thus, in 2013, the Lower Duwamish Waterway Group "and dozens of other potentially

16   responsible parties at the Duwamish site ('PRPs') initiated a voluntary alternative dispute

17   resolution process known as the Duwamish Allocation." *King County v. Travelers Indem. Co.*, No.

18   14-CV-1957 BJR, 2018 WL 1994119, at *1 (W.D. Wash. Apr. 27, 2018); *see also King County v.*

19   *Travelers Indem. Co.*, No. C14-1957 MJP, 2015 WL 4878011, at *1 (W.D. Wash. Aug. 14, 2015)

20   (explaining that the Duwamish Allocation seeks to allocate liability for contaminating the Lower

21   Duwamish Waterway site among 45 parties). The Duwamish Allocation is designed to facilitate

22   ───────────────────
              [2] Available at https://semspub.epa.gov/work/10/715975.pdf.

23             [3] With the approval of the EPA and other federal agencies, Boeing has already performed a major cleanup
     of the part of the waterway adjacent to its Plant 2 facility and created habitat to support salmon and other species in

24   the waterway. EPA, *Hazardous Waste Cleanup: Boeing Plan 2, Tukwila, Washington*, https://www.epa.gov/hwcor-
     rectiveactioncleanups/hazardous-waste-cleanup-boeing-plant-2-tukwila-washington (last visited Aug. 17, 2022);

25   Consent Decree at 4–5, *United States v. Boeing Co.*, No. 10-cv-00758-RSM (Dec. 14, 2010), ECF No. 8
     (acknowledging Boeing's commitment to habitat restoration work); App. A to Consent Decree at 1–20, *Boeing*, No.

26   10-cv-00758-RSM (May 4, 2010), ECF No. 2-2 (detailing habitat restoration work that Boeing committed to
     complete).

BOEING'S MOTION TO STAY
(No. 2:22-cv-00993-RAJ) – 4

the parties settling with each other and then, as a group, negotiating a consent decree with the EPA to fund and finish cleaning the waterway.

The Duwamish Allocation is governed by an Alternative Dispute Resolution Memorandum of Agreement ("MOA"), signed in 2014, and is designed to re-allocate the past costs incurred by "Participating Parties" as well as future cleanup costs. Decl. of Mark W. Schneider Ex. A; *see also* Decl. of Laura Wishik in Support of Plaintiff's Motion for Protective Order at 2:5–6, *City of Seattle v. Monsanto Co.*, No. 2:16-cv-00107-RSL (W.D. Wash. Jan. 17, 2020), ECF No. 139-3. To facilitate a fair allocation, the MOA provided that the Participating Parties would retain an experienced environmental lawyer to serve as the allocator (in essence as a private judge); exchange what turned out to be a huge volume of pages of historical and current records (Boeing alone collected over 750,000 documents representing millions of pages); respond to detailed questionnaires similar to comprehensive interrogatories and requests for production; exchange expert reports; take fact and expert depositions; hold meetings between the allocator and the parties' experts; brief and have the allocator decide motions for summary judgment on a variety of legal issues; and file opening, response, and reply briefs on the merits. Schneider Decl. Ex. A, at 8–17 (MOA § 5). After the allocator issued preliminary findings, the Participating Parties would submit comments and argument, which the allocator would respond to before issuing a final allocation report. *Id.* at 16 (MOA §§ 5.9.1–5.9.4).

The allocator issued his final report for the Duwamish Allocation setting out his recommended allocation share to each Participating Party. *Id.* ¶ 7. Following the final report, the MOA allows each party to accept or reject its share assigned by the allocator. *Id.* Ex. A, at 17 (MOA § 5.9.6). If they accept, the MOA sets out a five-month process for parties to negotiate "cash-out" settlement agreements with the parties who will perform the cleanup. *Id.* at 19, 27–29 (MOA § 8.2 & Exhibit A). The "cash-out" parties will pay their shares to the parties who will conduct the cleanup (in exchange for to-be-negotiated releases from further liability and costs). *Id.* at 19 (MOA § 8.2.1). The parties then must negotiate a consent decree with the EPA, under which

the performing parties will agree to perform the cleanup (using their own funds and, in part, the funds they obtained from the cash-out parties). *Id.* at 20 (MOA § 8.4). The MOA provides that a Participating Party in the Duwamish Allocation process may initiate litigation against another Participating Party only if it first withdraws from the agreement, and thus from the Duwamish Allocation. *See id.* at 24 (MOA § 12.2).

Ever since it selected the plan for cleaning the waterway in 2014, *see generally* Record of Decision, the EPA has been waiting for the parties to finish the Duwamish Allocation and for some parties to enter cash-out settlements, after which the EPA will begin negotiating a consent decree with the cash-out parties and the remaining parties—including Boeing—who intend to conduct the cleanup. Schneider Decl. ¶ 11. The EPA has now decided it is time to move forward with consent decree negotiations. *Id.* The EPA has told the participants that it will issue special notice letters to the Duwamish Allocation parties in October 2022. *See id.* Ex. B, at 1. In the CERCLA process, the "purpose of [notice letters] is to inform [a party] of their potential liability for future response costs, to begin or continue the process of information exchange, and to initiate the process of 'informal' negotiations." EPA, *Interim Guidance on Notice Letters, Negotiations, and Information Exchange* 7 (Oct. 1987).[4] The statute allows the EPA to send a "[s]pecial" notice letter to parties, which starts a 120-day settlement negotiation period with the EPA. 42 U.S.C. § 9622(e)(2)(A)–(B). Once the EPA and the parties reach agreement, their consent decree will be subject to a 30-day public notice and comment period, after which it will be presented to a court for approval. 42 U.S.C. § 9622(d)(2)(A). The Participating Parties who will conduct the cleanup will need to first finalize cash-out settlements with the other Participating Parties, and then all of those Participating Parties will negotiate a cleanup agreement with the EPA in response to the special notice letters.

The MOA limits what the Duwamish Allocation Participating Parties may disclose. Schneider Decl. Ex. A, at 21 (MOA § 9). Boeing may disclose that the allocator issued his final report and that, on July 11, 2022, Boeing accepted the share the allocator assigned with the intent

---

[4] Available at https://www.epa.gov/sites/default/files/documents/tran-notlet-mem.pdf.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

of beginning cash-out negotiations with the other Participating Parties. *Id.* ¶ 7. Other participants also accepted their shares. *Id.* The MOA prohibits a Participating Party that remains in the Duwamish Allocation process from filing suit against another Participating Party. *Id.* Ex. A, at 24 (MOA § 12.2). Boeing remains a Participating Party because it accepted its allocated share. *Id.* ¶ 7. The Port filed suit against Boeing on July 19, 2022. Having abandoned the Duwamish Allocation, the Port's share of responsibility must be determined in this litigation.

King County, the City of Seattle, and 28 other Participating Parties in the Duwamish Allocation support the Court staying this lawsuit because they are concerned that, without a stay, the Duwamish Allocation process will fail. Schneider Decl. ¶¶ 13–28, Exs. C–T; Decl. of Dwight Dively ¶ 8.

## ARGUMENT

"The power to grant a stay pending litigation is incidental to the power inherent in every court to control the disposition of the cases on its docket." *Landis v. N. Am. Co.*, 299 U.S. 248, 244–55 (1936). In deciding whether to grant a stay, courts consider three factors: (1) "the hardship or inequality which a party may suffer in being required to go forward"; (2) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay"; and (3) "the possible damage which may result from the granting of a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). Here, all three factors weigh decisively in favor of a stay.

**A.     Absent a stay, the eight-year allocation and settlement process will likely collapse.**

Without a stay, Boeing and the other parties to the settlement process will suffer serious hardship because Boeing will have little choice but to imperil the process by bringing protective third-party claims against everyone involved. The reason lies in CERCLA's structure. CERCLA creates two main causes of action for a private party. *See Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 704–06 (3d Cir. 2019) (offering a helpful overview). The first are cost recovery actions, which are governed by CERCLA § 107(a). Cost recovery actions allow a

1    "person" who incurs costs responding to the "release" or "threatened release" of a "hazardous

2    substance" from a "facility" to sue what are known as potentially responsible persons, or PRPs,

3    for the "necessary costs of response incurred . . . consistent with the national contingency plan."

4    *See* 42 U.S.C. § 9607(a). In most cases, PRPs sued under § 107(a) are jointly and severally liable.

5    *See Arizona*, 761 F.3d at 1011. This is great for the person suing because they can recover all the

6    costs they incurred from a single responsible party. But it can be unfair to the party being sued

7    because they might have to pay for someone else's mess.

8        To mitigate the potential unfairness associated with joint and several liability, Congress

9    created contribution actions, which are governed by CERCLA § 113(f). *See Cranbury*, 943 F.3d

10   at 706. Contribution actions allow a party that is sued under § 107(a) to "seek contribution" from

11   other responsible parties. *See* 42 U.S.C. § 9613(f)(1). When a party brings a contribution action, a

12   court must determine who is liable for the costs at issue and "allocate response costs among [the]

13   liable parties using such equitable factors as the court determines are appropriate." *Id.* By equitably

14   allocating responsibility between parties, a court effectively transforms each party's liability from

15   joint and several to several. *See Cranbury*, 943 F.3d at 706.

16       This structure all but requires Boeing to implead the many parties that the Port chose not

17   to sue. Each of those parties potentially shares some responsibility for the costs the Port allegedly

18   incurred. But because the Port chose to seek costs only from Boeing under § 107(a), Boeing

19   currently faces the prospect of paying for 100% of the Port's alleged costs—even costs that

20   everyone agrees should not be Boeing's responsibility. To avoid paying more than its fair share,

21   Boeing must bring contribution actions under § 113(f) against anyone who is potentially

22   responsible for the Port's alleged costs. In other words, Boeing must sue the Participating Parties

23   with whom it is currently negotiating settlements—which Boeing can do only if it first withdraws

24   from the Allocation Process. *See* Schneider Decl. Ex. A, at 24 (MOA § 12.2).

25       The settlement process could easily collapse if Boeing withdraws and the parties who

26   remain are embroiled in adversarial litigation. The parties already spent eight years in the

BOEING'S MOTION TO STAY
(No. 2:22-cv-00993-RAJ) – 8

1   Duwamish Allocation arguing vigorously over who owes what for the cleanup of the Lower

2   Duwamish Waterway. That process, though arduous and costly, was worthwhile because it

3   resulted in an impartial allocation of responsibility that Boeing and other parties were willing to

4   accept. But if the parties are forced to re-litigate their responsibility in this lawsuit, it could reopen

5   old wounds, engender ill-will, and ultimately undo the hard work that the parties accomplished

6   over the past eight years. At the very least, litigation would divert critical resources and attention

7   away from the settlement process.

8       Courts understand the threat that litigation poses to settlement, which is why they often

9   stay cases so that settlement negotiations can proceed unhindered. Two cases are representative.

10      The first is *Confederated Tribes & Banks of Yakima Nation v. Airgas USA, LLC*, 435 F.

11  Supp. 3d 1103, 1127 (D. Or. Aug. 8, 2019), which involved CERCLA § 107(a) claims relating to

12  the Portland Harbor Superfund Site. Ten years before *Yakima Nation* was filed, 200 other parties

13  began a settlement process designed to allocate response costs for the same Superfund site. *See id.*

14  at 1112–13, 1127. To protect the ongoing settlement process, several defendants in *Yakima Nation*

15  asked the district court to stay the case because it could disrupt or even derail a settlement. *See id.*

16  at 1126–27. The court agreed, reasoning that "[t]he 29 Defendants here would likely consider

17  themselves compelled to bring third-party claims against other potentially liable parties that are

18  not currently defendants here, and those third-party defendants in turn would likely bring their own

19  claims against other potentially liable parties, resulting in cascading litigation . . . ." *Id.* at 1128

20  (internal quotation marks omitted). The court also concluded that staying the case would promote

21  judicial economy because it involved "some," though not all, "of the same complex legal and

22  factual issues that are presented by the ongoing non-judicial allocation process." *See id.*

23      The court reached a similar conclusion in *Bowman v. 71 at Tulsa Hills Apartments, L.P.*,

24  No. 19-CV-00066, 2019 WL 3938479 (N.D. Okla. Aug. 20, 2019). The parties in *Bowman* planned

25  to attend a settlement conference, but the plaintiff wanted to conduct discovery and potentially file

26  dispositive motions. *See id.* at *1. The court concluded that "proceeding in discovery and drafting

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  dispositive motions may undermine the parties' ongoing efforts in remediation and settlement."

2  *Id.* The court therefore stayed the case to "facilitate swift remediation of the alleged barriers and

3  settlement of the instant action," a result that would "benefit[] both Plaintiff and persons not party

4  to the instant action who may be harmed by the alleged accessibility barriers." *Id.*

5        A stay is likewise appropriate here.[5] Staying the case will allow the many Participating

6  Parties that have accepted the allocator's decision to avoid contentious litigation and instead focus

7  on finalizing the allocation they have worked so hard to complete and turn it into settlements.

8  Settlements will, in turn, allow the Participating Parties to negotiate a consent decree with the EPA

9  to fund and perform cleanup of the Lower Duwamish Waterway. Those settlements will conserve

10  party and judicial resources for the reasons explained below. And most importantly, those

11  settlements will benefit the public by completing a major step in the cleanup of the waterway.

12  **B.**    **A stay will conserve party and judicial resources.**

13        Even assuming the Participating Parties could reach settlements during litigation, the Court

14  should still stay the Port's lawsuit because settlements will reshape the lawsuit.

15        A settlement will make the settling parties immune from contribution claims. The

16  allocation participants plan to enter a consent decree with the EPA and have the consent decree

17  approved by a district court. Once the consent decree is approved, the settling parties will have

18  "resolved [their] liability to the United States . . . in . . . [a] judicially approved settlement" and

19  will "not be liable for claims for contribution regarding matters addressed in the settlement." 42

20  U.S.C. § 9613(f)(2). Boeing is working with other Participating Parties and will be working with

21  the EPA to accomplish this resolution. But, if a stay is not granted, Boeing likely would be forced

22  to assert protective claims now and begin litigation against the same Participating Parties that it

23  

24       [5] Boeing seeks an eight-month stay because it will take two months for the EPA to issue special notice letters (in October 2022), consent decree negotiations will take at least four months (to January 2023), and those negotiations

25  will be followed by at least a 30-day public notice and comment period on a proposed decree (to at least March 2023). As early as March 2023, the EPA would file a complaint and simultaneously move for approval of the decree to

26  resolve its complaint, which could be assigned to this Court as a related case under LCR 3(g). The earliest that the consent decree could be approved is April 2023.

BOEING'S MOTION TO STAY
(No. 2:22-cv-00993-RAJ) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   seeks to settle with. Consequently, any litigation of those clams in this matter would be rendered

2   pointless if a settlement is reached.

3          Courts frequently stay a case if the case will be impacted by other proceedings. In *Naini v.*

4   *King County Public Hospital District No. 2*, No. C19-0886-JCC, 2020 WL 468910, at *3 (W.D.

5   Wash. Jan. 29, 2020), for example, Judge Coughenour stayed a doctor's lawsuit against a hospital

6   so that the hospital could conduct a fair hearing process regarding a committee's recommendation

7   not to renew the doctor's privileges at the hospital. The court acknowledged that "the fair hearing

8   process cannot resolve the legal questions presented," but stayed the case because "[t]he fair

9   hearing process will . . . provide an opportunity for the parties to address factual issues that are

10  integrally linked to the upcoming trial." *Id.* (citing *Leyva v. Certified Grocers of Cal., Ltd.*, 593

11  F.2d 857, 863–64 (9th Cir. 1979)). Similarly, in *Washington v. Trump*, No. C17-0141JLR, 2017

12  WL 2172020, at *3 (W.D. Wash. May 17, 2017), Judge Robart stayed the case pending a related

13  appeal that would admittedly "leave various issues unresolved." The court emphasized that the

14  appeal would "'settle many' issues and 'simplify' others such that a stay will facilitate the orderly

15  course of justice and conserve resources for both the court and the parties." *See id.* (quoting *Landis*,

16  299 U.S. at 256).

17         A stay in this case will likewise facilitate the orderly course of justice and conserve

18  resources. Not only will the settlement "address factual issues that are integrally linked to" the

19  Port's lawsuit, but the settlement will also "settle many issues" outright, including all contribution

20  claims against parties to the settlement. Boeing should not be forced to pointlessly re-litigate issues

21  it already resolved in the private allocation. And because the ultimate settlement with the EPA will

22  need to be judicially approved, it will also confirm the equitable shares for the settling parties and

23  not the Port. It will therefore directly affect the issues to be decided by this Court and narrow the

24  dispute between the Port and Boeing.

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**C.      A stay will not harm the Port because the Port seeks only money damages.**

Numerous parties will suffer significant hardship if the Court allows the Port's lawsuit to proceed, but the Port will not suffer any hardship if the Court stays the case. At worst, a stay will delay the date the Port is awarded money if it establishes that Boeing has any remaining liability after Boeing spent money cleaning up the portion of the Lower Duwamish Waterway adjacent to its Plant 2, paid 25% of the costs for studies performed under the EPA order, accepted its allocation share, and settled with the EPA. And this Court has recognized, "a potential delay in the recovery of money damages, . . . on its own, is insufficient to warrant denial of a stay." *Ten Bridges LLC v. Hofstad*, No. 19-cv-01134-RAJ, 2020 WL 6685153, at *2 (W.D. Wash. Nov. 12, 2020). The reason is that "money damages compensate a plaintiff for their injury regardless of when the money damages are awarded." *Naini*, No. C19-0886-JCC, 2020 WL 468910, at *2. And the stay will better define the amounts at issue as between Boeing and the Port, thereby benefiting the Port.

## CONCLUSION

A stay is warranted and necessary. Boeing respectfully asks the Court to grant the motion and stay the case for eight months so that the allocation and settlement process may be completed.

Dated: August 18, 2022                            By: s/ Mark W. Schneider
                                                                     Mark W. Schneider, WSBA No. 14105
                                                                     Kathleen M. O'Sullivan, WSBA No. 27850
                                                                     Meredith R. Weinberg, WSBA No. 45713
                                                                     Katherine E. Page, WSBA No. 32903
                                                                     Marten N. King, WSBA No. 57106
                                                                     **Perkins Coie LLP**
                                                                     1201 Third Avenue, Suite 4900
                                                                     Seattle, Washington 98101-3099
                                                                     Telephone: +1.206.359.8000
                                                                     Facsimile: +1.206.359.9000
                                                                     MWSchneider@perkinscoie.com
                                                                     KOSullivan@perkinscoie.com
                                                                     MWeinberg@perkinscoie.com
                                                                     KPage@perkinscoie.com
                                                                     MKing@perkinscoie.com

                                                                     Attorneys for Defendant
                                                                     The Boeing Company

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

BOEING'S MOTION TO STAY
(No. 2:22-cv-00993-RAJ) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000