UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PORT OF SEATTLE,<br><br>           Plaintiff,<br><br>   v.<br><br>THE BOEING COMPANY,<br><br>           Defendant. | CASE NO. C22-0993JLR<br><br>ORDER |

## I.   INTRODUCTION

Before the court is Defendant The Boeing Company's ("Boeing") motion to stay this case until April 2023.[1] (Mot. (Dkt. # 10); Reply (Dkt. # 15).[2]) Plaintiff Port of

---

[1] While Boeing's motion asks the court to stay this case for eight months, its motion was filed in August 2022 and discusses staying the case until April 2023. (*See generally Mot.*; *id.* at 10 n.5.) Accordingly, the court construes Boeing's motion as a request to stay this case until April 2023.

[2] When citing to the parties' pleadings, the court uses the pleadings' internal pagination unless otherwise stated.

ORDER - 1

1  Seattle (the "Port") opposes the motion.  (Resp. (Dkt. # 13).)  Boeing also filed

2  supplemental briefing in response to the court's November 2, 2022 and November 10,

3  2022 orders.  (*See* 11/2/22 Order (Dkt. # 19); Def. Supp. (Dkt. # 20); 11/10/22 Order

4  (Dkt. # 22); 11/14/22 Schneider Decl. (Dkt. # 23).)  The court has considered the parties'

5  submissions, the balance of the record, and the applicable law.  Being fully advised,[3] the

6  court GRANTS Boeing's motion to stay.

## II.  BACKGROUND

This action arises from the parties' involvement in the cleanup of the Lower
Duwamish Waterway ("LDW"), which has been contaminated by decades of industrial
releases associated with the use of the waterway, and adjacent upland areas, as Seattle's
major industrial corridor since the early 1900s.  (*See generally* Compl. (Dkt. # 1)); *see
also* EPA, *Record of Decision—Lower Duwamish Waterway Superfund Site* 1 (Nov.
2014), https://semspub.epa.gov/work/10/715975.pdf ("Record of Decision").[4]  From the
1960s to the present, the Port has "owned properties adjacent to the LDW" and has
"leased those properties to tenants for a variety of operations including (primarily) cargo

---

[3] Neither party has requested oral argument (*see* Mot. at 1; Resp. at 1), and the court has determined that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[4] Boeing refers to the EPA's 2014 Record of Decision in its pleadings (*see, e.g.*, Mot. at 4), and the court takes judicial notice of the document because it is a public record and the contents of the document are not subject to reasonable dispute given that they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); Fed. R. Evid. 201(b); *see, e.g.*, *BASF Corp. v. APC Inv. Co.*, No. CV 14-6456-GW(EX), 2022 WL 1840332, at *3 & nn.5-6 (C.D. Cal. Apr. 27, 2022) (taking judicial notice of the EPA's record of decision and remedial investigation and feasibility study report).

storage and shipping." (*See* Compl. ¶ 63.) The Port also inherited limited property rights in some of the LDW's submerged lands from the former Commercial Waterway District No. 1 of King County upon its dissolution in 1963. (*See id.* ¶¶ 64-68.) Boeing has owned and/or operated a number of facilities adjacent to the LDW since the early 1900s. (*See id.* ¶¶ 48-60.)

**A.      Lower Duwamish Waterway Group**

In 2000, Boeing, the Port, the City of Seattle, and King County formed the Lower Duwamish Waterway Group ("LDWG") and entered into an administrative order on consent with the Environmental Protection Agency ("EPA") and the Washington Department of Ecology ("Ecology"). (*Id.* ¶ 17; *see also* 11/14/22 Schneider Decl. ¶ 2, Ex. A ("Order on Consent").) That order required the LDWG parties to conduct a remedial investigation and feasibility study[5] to "investigate the nature and extent of" contamination in the LDW and "develop remedial alternatives" for the LDW. (Compl. ¶ 17; *see also* Order on Consent.) The LDWG parties agreed to share costs of the remedial investigation and feasibility study equally—with each party paying 25%—as an interim arrangement, with the understanding that those costs would later be re-allocated. (Compl. ¶ 18.)

The remedial investigation and feasibility study were ultimately completed in 2012. Record of Decision, *supra*, at 4. However, the 2000 administrative order on

---

[5] The study was ordered pursuant to both the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and Washington's Model Toxics Control Act ("MTCA"), RCW 70A.305.010 *et seq.* (*See* Compl. ¶ 17.)

consent has since been amended five times to "provide for additional studies, sampling, and analysis to prepare the way for EPA's selected remedy." (Compl. ¶ 20; *see also id.* ¶¶ 20-21 (alleging that the LDWG parties have continued to equally share costs associated with the amendments to the order on consent); 11/14/22 Schneider Decl. ¶ 2, Exs. B-F (amendments to the administrative order on consent).) As a result, the LDWG parties are still engaging in activities related to "the investigation and planning necessary to perform the LDW cleanup." (Compl. ¶ 21.) According to the Port, "[s]ince 2000, the LDWG parties have collectively incurred approximately $60 million in LDWG-Shared Costs to implement the [a]dministrative [o]rder on [c]onsent (as amended), and the Port has incurred approximately $15 million as its share of those costs." (*Id.* ¶ 69; *see also id.* ¶ 70 (alleging that the Port has also incurred "approximately $8 million of other recoverable costs . . . that were necessary for implementing the [a]dministrative [o]rder on [c]onsent but that were not covered under LDWG's interim cost-sharing agreement").)

B.  **Lower Duwamish Waterway Allocation and Settlement Process**

In 2013, the LDWG parties "and dozens of other potentially responsible parties at the Duwamish site ['PRPs'][6] initiated a voluntary alternative dispute resolution ['ADR'] process known as the Duwamish Allocation." *King Cnty. v. Travelers Indem. Co.*, No. C14-1957BJR, 2018 WL 1994119, at *1 (W.D. Wash. Apr. 27, 2018). The non-binding ADR proceedings—which commenced in April 2014 and are still ongoing—seek to allocate liability for contaminating the LDW among 45 PRPs. *See King Cnty. v.*

---

[6] The PRPs are parties who may have contributed to the contamination of the LDW. *See* Record of Decision, *supra*, at 7.

ORDER - 4

*Travelers Indem. Co.*, No. C14-1957MJP, 2015 WL 4878011, at *1 (W.D. Wash. Aug. 14, 2015).

The Duwamish Allocation is governed by an ADR Memorandum of Agreement ("MOA") and is designed to re-allocate 100% of the past costs, as well as future cleanup costs, incurred by "Participating Parties"—i.e., PRPs that sign the MOA and have not withdrawn or been expelled from participation in the Duwamish Allocation process. (*See* 8/18/22 Schneider Decl. (Dkt. # 12), Ex. A ("MOA") at 1, 3.[7]) It is also designed to facilitate the parties settling with each other and then, as a group, negotiating and entering into a consent decree with the EPA, "pursuant to which the EPA will then direct and oversee performance of the clean-up" for the LDW. (*See* Dively Decl. (Dkt. # 11) ¶¶ 4-5.) As provided for in the MOA, the Participating Parties retained an experienced environmental lawyer to serve as the allocator; exchanged voluminous historical and current records; responded to detailed questionnaires similar to comprehensive interrogatories and requests for production; exchanged expert reports; took fact and expert depositions; held meetings between the allocator and the parties' experts; briefed and had the allocator decide motions for summary judgment on a variety of legal issues; and filed opening, response, and reply briefs on the merits. (*See* MOA at 8-17.) After the allocator issued preliminary findings, the Participating Parties submitted comments and argument, which the allocator responded to before issuing a final allocation report. (*Id.* at 16.)

---

[7] When citing to the MOA, the court uses the document's internal pagination unless otherwise stated.

In 2022, the allocator issued his final report for the Duwamish Allocation, which set out his recommended allocation share for Participating Party. (*See* 8/18/22 Schneider Decl. ¶ 7.) Following the issuance of the final report, each party had 60 days to accept or reject its share assigned by the allocator. (MOA at 17.) If a Participating Party accepts its share, the MOA sets out a five-month process for parties to negotiate "cash-out" settlement agreements with the parties who will perform the cleanup. (*Id.* at 19, 27-29.) The "cash-out" parties—i.e., "parties with smaller assigned shares of responsibility"— will pay their shares to the "performing" parties that will conduct the cleanup in exchange for to-be-negotiated releases from further liability and costs. (*See* 8/18/22 Schneider Decl. ¶ 12; MOA at 19.) The remaining Participating Parties must then negotiate a consent decree with the EPA, under which the performing parties will agree to perform the cleanup using their own funds and, in part, the funds they obtained from the cash-out parties. (*See* 8/18/22 Schneider Decl. ¶ 12; MOA at 20.) The MOA provides that a Participating Party who rejects its share will cease to be a Participating Party in the Duwamish Allocation. (MOA at 17.)

On July 11, 2022, Boeing accepted the share that the allocator assigned to it. (8/18/22 Schneider Decl. ¶¶ 7, 10.) According to Boeing, the other Participating Parties also accepted their shares. (*Id.* ¶ 7; *see also id.* ¶ 10 ("The remaining Participating Parties in the Duwamish Allocation process similarly wish to proceed with negotiating the cash-out settlements and a consent decree with EPA . . . .").) The remaining Participating Parties in the Duwamish Allocation have since begun cash-out settlement negotiations, which remain ongoing as of November 9, 2022. (*See* 8/18/22 Schneider Decl. ¶ 12; Def.

Supp. at 1-2 (discussing the status of those negotiations).) The Participating Parties who will conduct the cleanup will need to first finalize cash-out settlements with the other Participating Parties, and then all Participating Parties will negotiate a cleanup agreement with the EPA in response to the special notice letters. (*See* 8/18/22 Schneider Decl. ¶ 12.)

According to Boeing, "[e]ver since it selected the plan for cleaning the waterway in 2014, the EPA has been waiting for the parties to finish the Duwamish Allocation and for some parties to enter cash-out settlements, after which the EPA will begin negotiating a consent decree with the cash-out parties and the remaining parties—including Boeing—who intend to conduct the cleanup." (Mot. at 6 (first citing Record of Decision, *supra*; and then citing 8/18/22 Schneider Decl. ¶ 11) (citation omitted).) On July 15, 2022, the EPA told the Participating Parties that it had decided to move forward with consent decree negotiations and would issue special notice letters to the Duwamish Allocation parties in October 2022.[8] (*See* 8/18/22 Schneider Decl. ¶ 11, Ex. B.) As of November 9, 2022, the EPA had not yet issued special notice letters to the Participating Parties. (11/9/22 Schneider Decl. (Dkt. # 21) ¶ 2.) However, the EPA informed Boeing that it "intends to issue special notice letters at or before the end of this calendar year." (*Id.* ¶¶ 3-5, Ex. A; *see also* Def. Supp. at 2.)

---

[8] After the EPA issues special notice letters to parties, the parties begin a 120-day settlement negotiation period with the EPA. 42 U.S.C. § 9622(e)(2)(A)-(B). Once the EPA and the parties reach agreement, their consent decree will be subject to a 30-day public notice and comment period, after which it will be presented to a court for approval. 42 U.S.C. § 9622(d)(2)(A).

ORDER - 7

## C. This Litigation

The Port, however, declined to accept its share and is thus no longer a Participating Party in the Duwamish Allocation. (*See* Resp. at 2; MOA at 17 (providing that a Participating Party may decline its share); MOA at 24 (providing that Participating Party in the Duwamish Allocation process may initiate litigation against another Participating Party only if it first withdraws from the agreement, and thus from the Duwamish Allocation).) The Port then filed suit against Boeing on July 19, 2022, seeking to recover costs it has incurred, and will incur, in association with the cleanup of the LDW because it contends that Boeing bears the lion's share of responsibility for the contamination of the LDW. (*See generally* Compl. ¶¶ 4-35, 69-74 (describing Boeing as the Participating Party with the greatest responsibility for contamination of the LDW and describing the Port as a *de minimis* contributor to the contamination).) Specifically, the Port brings claims against Boeing for cost recovery under CERCLA section 107(a), 42 U.S.C. § 9607(a); declaratory judgment under CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2); recovery of remedial action costs under the MTCA, RCW 70A.305.080; and declaratory judgment under the MTCA, RCW 70A.305.040 and 70A.305.080. (*See generally id.* ¶¶ 75-114.) Having withdrawn from the Duwamish Allocation, the Port's share of responsibility with respect to the contamination in the LDW must be determined in this litigation.

## III. ANALYSIS

Boeing now moves to stay this case until April 2023. (*See generally* Mot. at 1 (staying the case until then will, according to Boeing, allow the Participating Parties to

complete the settlement process with each other and the EPA before the Port proceeds with this lawsuit); *id.* at 10 n.5.[9]) It argues that a stay is warranted for three reasons: (1) if this litigation proceeds, it could "disrupt or even derail the ongoing settlement process"—i.e., the finalization of cash-out settlements between Participating Parties, the negotiation of a consent decree with the EPA to implement the cleanup, and the presentation of the consent decree to a court for approval; (2) "successful settlements would significantly reshape the Port's lawsuit and save judicial resources"; and (3) a stay will not harm the Port because the Port's lawsuit is "a lawsuit over money" and "at worst, a stay might delay the Port's recovery of money." (*Id.* at 2.) The court discusses the relevant statutory framework before considering Boeing's motion to stay.

**A.     Relevant Statutory Framework**

"CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). In enacting CERCLA, Congress had two main goals: (1) to encourage the "expeditious and efficient cleanup of

---

[9] When Boeing filed its motion in August 2022, it stated the following regarding the duration of its requested stay:

> Boeing seeks an eight-month stay because it will take two months for the EPA to issue special notice letters (in October 2022), consent decree negotiations will take at least four months (to January 2023), and those negotiations will be followed by at least a 30-day public notice and comment period on a proposed decree (to at least March 2023). As early as March 2023, the EPA would file a complaint and simultaneously move for approval of the decree to resolve its complaint, which could be assigned to this [c]ourt as a related case under LCR 3(g). The earliest that the consent decree could be approved is April 2023.

(Mot. at 10 n.5.)

hazardous waste sites," and (2) to ensure that polluting parties pay for cleanup. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001). To achieve these goals, CERCLA imposes strict, joint and several liability on certain classes of persons for the cleanup of environmental contamination, known as "potentially responsible parties," or PRPs. *Arizona v. City of Tucson*, 761 F.3d 1005, 1011 (9th Cir. 2014); *Burlington N & Santa Fe Ry. v. United States*, 556 U.S. 599, 608-09 (2009).

CERCLA provides two forms of legal action by which parties may recoup some or all of their costs associated with the cleanup of hazardous waste: cost recovery actions under 42 U.S.C. § 9607(a) (CERCLA § 107(a)); and contribution actions under 42 U.S.C. § 9613(f) (CERCLA § 113(f)). *See Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 704-06 (3d Cir. 2019) (offering a helpful overview). Cost recovery actions allow a "person" who incurs costs responding to the "release" or "threatened release" of a "hazardous substance" from a "facility" to sue what are known as potentially responsible persons, or PRPs, for the "necessary costs of response incurred . . . consistent with the national contingency plan." *See* 42 U.S.C. § 9607(a). In most cases, PRPs sued under § 107(a) are jointly and severally liable. *See Arizona*, 761 F.3d at 1011. While this allows the individual suing to recover all the costs they incurred from a single responsible party, it can be unfair to the single party being sued because they may have to pay more than their equitable share of response costs. *See Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1132 (D. Or. 1996), *aff'd in part*, *remanded in part*, 207 F.3d 1177 (9th Cir. 2000).

//

To mitigate the potential unfairness associated with joint and several liability, Congress created contribution actions, which are governed by CERCLA § 113(f). *See Cranbury*, 943 F.3d at 706. Contribution actions allow a party that is sued under § 107(a) to "seek contribution" from other responsible parties. *See* 42 U.S.C. § 9613(f)(1). When a party brings a contribution action, a court must determine who is liable for the costs at issue and "allocate response costs among [the] liable parties using such equitable factors as the court determines are appropriate." *Id.* By equitably allocating responsibility between parties, a court effectively transforms each party's liability from joint and several to several. *See Cranbury*, 943 F.3d at 706. However, once a PRP enters into a judicially approved consent decree with the EPA, that party will have "resolved [their] liability to the United States . . . in . . . [a] judicially approved settlement" and will "not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2).

**B.   Boeing's Motion to Stay**

The court sets forth the relevant legal standard before discussing whether a stay is warranted in this case.

1. <u>Legal Standard</u>

A district court "has broad discretion to stay proceedings" in its own court. *See Clinton v. Jones*, 520 U.S. 681, 706-07 (1997); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The power to stay is "incidental to the power inherent in every court to control the disposition of the causes of action on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254. A district court may "find

it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Certified Grocers of Cali, Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979). The issues involved in the pending proceedings need not be "controlling of the action before the court" for the court to issue a stay. *Id.* at 864. "Indeed, where a stay is considered pending the resolution of another action, the court need not find that two cases involve identical issues; a finding that the issues are substantially similar is sufficient to support a stay." *Washington v. Trump*, No. C17-0141JLR, 2017 WL 1050354, at *4 (W.D. Wash. Mar. 17, 2017) (citing *Landis*, 299 U.S. at 254). A stay based on independent proceedings should only be granted if "it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Leyva*, 593 F.2d at 864. "[I]f there is even a fair possibility" that the stay will damage another party, then the proponent of the stay "must make out a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 255.

In determining whether to stay a case, "the competing interests which will be affected by the granting or refusal to grant a stay must be weighed." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citing *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)). Those interests include: (1) "the possible damage which may result from the granting of a stay"; (2) "the hardship or inequity which a party may suffer in being required to go forward"; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be

expected to result from a stay." *Id.* "The proponent of a stay bears the burden of establishing its need." *Clinton*, 520 U.S. at 708 (citing *Landis*, 299 U.S. at 255).

        2. <u>Whether a Short Stay is Warranted</u>

Here, the court finds that these factors weigh in favor of staying this case until April 2023. First, the court agrees with Boeing's contention that a short stay is unlikely to meaningfully harm the Port in light of the relief that the Port seeks in this case, the length of the requested stay, and the early stage of this litigation. (*See* Reply at 6; Mot. at 10 n.5, 12.) The Port argues that it will be harmed if the case is stayed because a stay will further delay its ability to recoup the millions of dollars it has spent as part of the LDW cleanup process over the last 20 years, as well as the cleanup costs it will continue to incur.[10] (*See* Resp. at 2-4.) As to the Port's request for damages to remedy past economic injuries, "a potential delay in the recovery of money damages, . . . on its own, is insufficient to warrant denial of a stay," *Ten Bridges LLC v. Hofstad*, No. C19-1134RAJ, 2020 WL 6685153, at *2 (W.D. Wash. Nov. 12, 2020), because "money damages compensate a plaintiff for their injury regardless of when the money damages are awarded," *Naini v. King Cnty. Pub. Hosp. Dist. No. 2*, No. C19-0886JCC, 2020 WL 468910, at *2 (W.D. Wash. Jan. 29, 2020). Additionally, the court agrees with Boeing's

---

[10] In this action, the Port seeks monetary damages for LDW cleanup costs that it has already incurred and a declaratory judgment for future LDW cleanup costs that it will incur. (*See, e.g.*, Compl. at 15-24.) According to the Port, a stay "will only prolong the very inequity the Port seeks to cure" because the Port (and, by extension, its taxpayers) will have to continue "subsidizing Boeing's cleanup process costs (i.e., remedial design costs)" "until the parties settle or this [c]ourt renders a judgment correcting the imbalance." (Resp. at 4; *see id.* at 1-3 (claiming that the Port has paid, and continues to pay, more than its fair share of the LDW cleanup costs given that "the party that is by far the most responsible for LDW contamination" is Boeing).)

contention that the same reasoning should apply here with respect to the Port's request for declaratory relief to remedy present, ongoing economic injuries because "any future judgment will fully compensate the Port for the money it might spend [through April 2023], with interest." (Reply at 6); *see also* 42 U.S.C § 9607(a) (allowing a party to recover interest).

Second, the court finds that Boeing and the other Participating Parties will likely suffer serious hardship without a short stay. Boeing argues that absent a stay, "the eight-year allocation and settlement process will likely collapse" because "Boeing will have little choice but to imperil the process by bringing protective third-party claims against everyone involved" in light of "CERCLA's structure."[11] (Mot. at 7-8.) While the Port argues that a stay is not warranted to prevent such harm because Boeing will not be "forced" to immediately bring contribution claims against the other Participating Parties (Resp. at 5-6), the court rejects such an argument. Even though it may be a few months before the other Participating Parties receive immunity from contribution claims,[12] the court agrees that Boeing would face a significant risk if it were to "litigat[e] the Port's theory without the certainty of final settlements this [c]ourt can consider in an allocation

---

[11] Because the Port seeks costs only from Boeing under § 107(a), Boeing argues that it "currently faces the prospect of paying for 100% of the Port's alleged costs—even costs that the other Participating Parties "potentially share[] some responsibility for." (Mot. at 8.) To avoid paying more than its fair share, Boeing contends that it "must bring contribution actions under § 113(f) against anyone who is potentially responsible for the Port's alleged costs"—i.e., "Boeing must sue the Participating Parties with whom it is currently negotiating settlements[,] which Boeing can do only if it first withdraws from the Allocation Process." (*Id.*)

[12] As explained above, Boeing would be barred from asserting contribution claims against the other Participating Parties if those parties enter into a judicially approved settlement with the EPA. *See* 42 U.S.C. § 9613(f)(2).

or the presence of all parties ensuring equitable contribution between all parties." (Reply at 5.) Although Boeing could, without a court-ordered stay, continue to engage in the allocation and settlement process and wait a few months to bring contribution claims against the other Participating Parties, the court agrees with Boeing that such a course of action would be "both inefficient and inequitable." (*Id.* at 6 (discussing why adding the other Participating Parties to this case in a few months would be disruptive and prejudicial, and arguing, "to the extent a party is harmed if it must wait to litigate a claim, Boeing faces the same harm from a self-imposed stay that the Port faces from a court-issued one.").) For these reasons, the court agrees with Boeing that if this litigation is not briefly stayed, it could potentially disrupt or even derail the ongoing, eight-year allocation and settlement process and harm Boeing and the other Participating Parties.[13] *See, e.g.*, *Confederated Tribes & Bands of Yakama Nation v. Airgas USA, LLC*, 435 F. Supp. 3d 1103, 1128 (D. Or. 2019) (staying case in light of, among other things, the possibility that continued litigation could "disrupt or even derail" the non-judicial allocation and settlement process).

Finally, the court agrees with Boeing's contention that a short stay will "facilitate the orderly course of justice and conserve resources" because any settlements between the Participating Parties and with the EPA will "address factual issues that are integrally

---

[13] In support of its requested stay, Boeing submits statements from the City of Seattle, King County, and 28 other allocation participants in which the entities express concerns that settlement negotiations will likely fall apart if Boeing withdraws from the Duwamish Allocation and brings contribution claims against the other Participating Parties "at this critical juncture." (*See* Dively Decl. ¶ 8; *see also, e.g.*, 8/18/22 Schneider Decl. ¶¶ 13-30, Exs. C-T (statements from Participating Parties).)

ORDER - 15

linked to the Port's lawsuit" and "settle many issues outright, including all contribution claims against parties to the settlement." (Mot. at 11 (internal quotation marks omitted).) The Port argues that this case "involves weighing facts and equitable factors only as between Boeing and the Port" and thus, any settlements between Boeing, the other Participating Parties, and the EPA "will have no impact on resolving the Port's claims against Boeing." (Resp. at 8-9.) The court, however, disagrees with the Port and instead agrees with Boeing that the Participating Parties' allocated shares are relevant to the court's equitable allocation of the LDW cleanup costs between the Port and Boeing in this action. *See, e.g.*, *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 19 (1st Cir. 2004) (stating that "a fair and equitable allocation [can] only be achieved by comparing [a defendant's] role as a PRP to other PRPs"). As Boeing notes, "[i]f the shares of the [Participating Parties] are finalized in settlements between those parties and with the EPA, then this [c]ourt can allocate what the Port has overpaid (if anything) with the benefit of evidence about other parties' agreed-to shares." (Reply at 2 (stating that "the [c]ourt will have more clarity about the equitable redistribution of anything the Port has overpaid").) Thus, in equitably allocating the LDW cleanup costs between the Port and Boeing, it will be easier and more efficient for the court to consider the responsibility of all parties for the contamination at the LDW once the Participating Parties finalize their settlements and enter into a consent decree with the EPA.[14] (*See* Reply at 4.)

---

[14] Additionally, if the court were to deny Boeing's motion to stay, Boeing argues that it would need to bring contribution claims against the other Participating Parties. (Mot. at 10-11.) Those claims could, however, be mooted if those other Participating Parties receive immunity from contribution claims through settlements with the EPA. (*Id.*) Thus, the court agrees with

1      In sum, the court concludes that the factors weigh in favor of staying this case

2  until April 2023.  Accordingly, the court GRANTS Boeing's motion to stay and STAYS

3  case until April 30, 2023.  In addition, should circumstances otherwise change such that

4  lifting the stay is warranted, either party may move to lift the stay.  In accordance with

5  the Honorable Judge Richard A. Jones's September 11, 2022 initial scheduling order,

6  Boeing shall file its answer to the Port's complaint by no later than May 15, 2023.

7  (9/11/22 Order (Dkt. # 17).)  Moreover, pursuant to that order, the parties shall hold a

8  Federal Rule of Civil Procedure 26(f) conference by no later June 12, 2023; exchange

9  initial disclosures by no later than June 19, 2023; and file a joint status report by no later

10  than June 26, 2023.  (*Id.*)

## IV.    CONCLUSION

12      For the foregoing reasons, the court GRANTS Boeing's motion to stay this case

13  until April 2023 (Dkt. # 10).  This case shall be stayed until April 30, 2023.  Boeing shall

14  file its answer to the Port's complaint by no later than May 15, 2023, and the parties shall

15  hold a Federal Rule of Civil Procedure 26(f) conference by no later June 12, 2023;

16  exchange initial disclosures by no later than June 19, 2023; and file a joint status report

17  by no later than June 26, 2023.

18  //

19  //

20  //

---

Boeing that a stay will also conserve judicial resources in that "any litigation of those [contribution] clams in this matter would be rendered pointless if a settlement is reached."  (*Id.*)

ORDER - 17

Dated this 23rd day of November, 2022.

_____
JAMES L. ROBART
United States District Judge

ORDER - 18